**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 15-20070-CR-GRAHAM/SIMONTON**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**

**CHRISTOPHER JERMAIN SPANN,**

      **Defendant.**

                                 /

## REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS

      Presently pending before this Court is Defendant Christopher Jermain Spann's Motion to Suppress.  ECF No. [18].  The Government has responded in opposition. ECF No. [22].  Defendant Spann did not file a reply.  This motion was referred to the undersigned Magistrate Judge by the Honorable Donald L. Graham, United States District Judge. ECF No. [19].  An evidentiary hearing was held on March 31, 2015, ECF No. [24]. Based upon the Findings of Fact and Conclusions of Law set forth below, the undersigned RECOMMENDS that the Motion to Suppress be DENIED.

      I.      **BACKGROUND**

      Defendant Christopher Jermain Spann is charged in a one-count Indictment with knowingly possessing a firearm and ammunition in and affecting interstate and foreign commerce, after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). ECF No. [8].

      In the presently pending motion, Mr. Spann seeks to suppress the firearm and ammunition that forms the basis for the Indictment.  He contends that the stop and search of the car in which he was a passenger, and from which the loaded firearm was seized, was not supported by probable cause.  ECF No. [18].  In opposition, the Government contends that the car was stopped based on probable cause to believe that

the Defendant had violated Fla. Stat. § 790.053, which makes it a criminal offense for a person to openly carry any firearm; and, that there was probable cause to believe that the subject firearm was inside the trunk of the car that was searched following the stop. ECF No. [22].  The Defendant argues that the police did not have probable cause to believe that he violated this prohibition because the police did not ask him why he was carrying the firearm before conducting the search; and, therefore they did not negate certain statutory exceptions to the prohibition against openly carrying a firearm.  ECF No. [18].

As the facts below reflect, it is undisputed that on January 30, 2015, police officers saw Mr. Spann openly carry a rifle from the courtyard of an apartment complex to a car, place the rifle in the trunk of the car, and enter the car as a passenger.  After the car drove away, it was stopped by the police, and the defendant and the driver were ordered out of the car, and the Defendant was handcuffed and ordered to sit on the curb.  The police opened the trunk, revealing the rifle at issue.  Defendant Spann contends that there was not probable cause to stop and search the car because the police did not negate certain exceptions to the prohibition against openly carrying a firearm since they did not question Mr. Spann concerning his reason for carrying the rifle before searching the trunk of the car.  ECF No. [18].

The Government contends that the observation of Mr. Spann openly carrying the weapon through the courtyard at night in a high crime area established probable cause to believe that he had violated Fla. Stat. § 790.053, and that it was not necessary for the police to ask Mr. Spann any questions or negate the affirmative defenses before stopping the car and searching its trunk.  ECF No. [22] at 3-7.  In the alternative, the Government argues that even if the police mistakenly believed that the Defendant had violated the law when he had not, they acted reasonably in interpreting Fla. Stat. § 790.053 to apply to the

conduct of Mr. Spann, and therefore under *Heien v. North Carolina*, 135 S. Ct. 530 (2014), the evidence should not be suppressed.  ECF No. [22] at 7-8.[1]

II.     FINDINGS OF FACT[2]

At the evidentiary hearing, the Government called as witnesses Detective Alain Cruz and Detective Brandon Ashe of the Miami-Dade Police Department, both of whom gave credible testimony that was consistent in all material respects.  The defense relied upon its cross-examination of these witnesses.  Based upon this testimony, the undersigned finds the following facts.

Detective Alain Cruz has been employed by the Miami-Dade Police Department for fourteen years, and at the relevant time was assigned to the gang unit of the narcotics bureau.  He is an experienced narcotics detective who has observed thousands of hand-to-hand narcotics sales, and is familiar with firearms.  On January 30, 2015, at approximately 9:00 p.m., he was parked across the street from an apartment complex in the Liberty City area of Miami-Dade County, conducting an undercover surveillance of a group of individuals who appeared to be selling narcotics in that location.  The specific area is a high crime area where there have been numerous shootings and a high volume of drug transactions.

---

[1]   The Government has not suggested that even in the absence of probable cause, the stop of the car was supported by at least reasonable suspicion to investigate the criminal activity, and that the Defendant lacks standing to challenge the subsequent search of the trunk of the car in which he rode as a passenger.  *See United States v. Sharpe*, 470 U.S. 675 (1985) (police may conduct an investigatory stop of a car based on reasonable suspicion); *United States v. Mikell*, 102 F.3d 470 (11th Cir. 1996) ("in the absence of probable cause, the police may stop a car and briefly detain it and its occupants in order to investigate a reasonable suspicion that such persons are involved in criminal activity"); *Rakas v. Illinois*, 439 U.S. 128 (1978) (mere passenger in a car does not have standing to challenge a search of that car).  Therefore, this potential issue is not considered by the Court.

[2]   To the extent that these Findings of Fact are more properly characterized as Conclusions of Law, the undersigned intends that they be treated as such, and vice versa.

Detective Cruz noticed a Dodge Charger parked on the swale next to the apartment complex, with its trunk open.  About ten minutes after he first noticed the Dodge Charger, he saw a person he later identified as Defendant Spann coming across the courtyard of the apartment complex, carrying a rifle.  Detective Cruz did not see Mr. Spann come out of any apartment.  Mr. Spann looked up and down the street, and then did a "light jog" toward the Charger.  When Mr. Spann reached the car, he put the rifle inside the open trunk, closed the trunk and entered the passenger side of the car.  The Defendant was wearing regular civilian clothing, and did not appear to be part of the group that Detective Cruz saw engaging in drug activity in the apartment complex.

Detective Cruz was about 30 feet away from the Charger, and he had observed the Defendant carrying the rifle for about 10 to 15 seconds before the rifle was placed in the trunk.  Detective Cruz called for a backup or "takedown" unit to arrest the Defendant for openly carrying a weapon in violation of Florida law.  Detective Cruz did not stop or arrest the Defendant since he was working in an undercover capacity in a surveillance car at the time.

About two or three minutes later, before the takedown unit arrived, the Dodge Charger drove away, and Detective Cruz followed the Charger and provided information to the takedown unit regarding the travel of the Charger. The Charger was stopped by Detective Brandon Ashe after traveling for about two or three minutes.

Detective Ashe and his partner approached the Charger with their guns drawn and ordered the occupants out of the car.  Mr. Spann was in the passenger's side of the car, and he was handcuffed and directed to sit down on the curb after he exited the car.  The driver of the car was a female, who was not handcuffed, and who stood next to Mr. Spann on the curb.  Detective Ashe then opened the trunk of the car since that is where he was told the firearm was located.  Detective Ashe did not know if there was somebody in the trunk that had access to the firearm, and wanted to secure the firearm for safety reasons.

4

Once Detective Ashe observed the rifle and saw that there was nobody in the trunk, he asked Mr. Spann if he had identification or a permit for the rifle, to which Mr. Spann responded that he had no ID or permit.  Detective Ashe then took photographs of the rifle, and conducted computer checks.  The computer checks revealed that Mr. Spann was a convicted felon.  At that time, Detective Spann took the Defendant into custody, and retrieved the firearm from the trunk of the car.

Neither Detective Cruz nor Detective Ashe knew Mr. Spann prior to this time.  The car was stopped and the trunk was opened solely on the grounds that Detective Cruz had seen Mr. Spann openly carrying the rifle and putting it in the trunk of the car, as described above, and not based on any other criminal activity or traffic infractions.

III.   LEGAL ANALYSIS

A.   The Determination of Probable Cause

Since the only issue in this case is whether the observations of Detective Cruz gave rise to probable cause to believe that the Defendant was violating the law that prohibits the open carrying of a firearm, it is important to review the standards that govern this determination.  In *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983), the United States Supreme Court held that a determination of probable cause must be based on evaluation of the totality of the circumstances, and set forth the following guidance:

> Perhaps the central teaching of our decisions bearing on the probable cause standard is that it is a "practical, nontechnical conception." *Brinegar v. United States*, 338 U.S. 160, 176 (1949). "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.*, at 175.  Our observation in *United States v. Cortez*, 449 U.S. 411, 418 (1981), regarding "particularized suspicion," is also applicable to the probable cause standard:
>
> > The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same--and so

> are law enforcement officers. Finally, the evidence thus
> collected must be seen and weighed not in terms of
> library analysis by scholars, but as understood by those
> versed in the field of law enforcement.

As these comments illustrate, probable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules.  The Court then provided the following standards to apply when determining the existence of probable cause:

> [T]he term "probable cause,"  . . . means less than evidence which would
> justify condemnation. . . . It imports a seizure made under circumstances
> which warrant suspicion. . . . Finely tuned standards such as proof beyond
> a reasonable doubt or by a preponderance of the evidence, useful in formal
> trials, have no place in the magistrate's decision.
>
> . . . .
>
> The task . . . is simply to make a practical, common-sense decision
> whether, given all the circumstances . . . there is a fair probability that
> contraband or evidence of a crime will be found in a particular place.

462 U.S. at 235, 238-239 (internal citations omitted).

In deciding whether there is probable cause to arrest, the court may examine the collective knowledge of law enforcement officers involved in the investigation.  *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir.  2004) (collective knowledge of the officers is relevant to probable cause inquiry); *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir.  1985) (same).  Finally, the determination of probable cause is an objective determination, made without regard to the subjective beliefs of the officers.  *Whren v. United States*, 517 U.S. 806, 813 (1996); *Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997).

## B.  The Florida Law Prohibiting the Open Carrying of Firearms

Section 790.053 of the Florida Statutes makes it a second degree misdemeanor for any person to openly carry a firearm.  The statute provides an exception that permits a person who is lawfully carrying a firearm in a concealed manner to briefly and openly

display the firearm.  In addition, Section 790.25 provides that the above prohibition against openly carrying a firearm does not apply to persons who are described in the following enumerated circumstances: members of the military when on duty or preparing for such duty; persons carrying out or training for emergency management duties; law enforcement officers; state or federal employees authorized to carry concealed weapons; persons employed as guards for the transportation of things of value while working in that capacity; persons engaged in fishing, camping or hunting, or going to or returning from a fishing, camping or hunting expedition; persons engaged in the business of manufacturing, repairing or dealing in firearms; persons firing weapons for testing or target practice under safe conditions and in a safe place not prohibited by law, or in an indoor range; persons traveling by private conveyance when the weapon is securely encased and not in the person's manual possession; persons carrying an unloaded pistol in a secure wrapper between his home and a place of purchase or repair; persons possessing arms at home or in their place of business; and investigators employed by a public defender's office or the capital collateral regional counsel's office while carrying out their official duties.  In *Norman v. State*, No. 4D12-3525, 2015 WL 669582 at *17, ___So. 3d ___ (Fla. Dist. Ct. App. Feb. 18, 2015), the Fourth District Court of Appeal of Florida recognized that the above exceptions are affirmative defenses rather than elements of the offense that the State is required to disprove.

      C.  <u>Legal Analysis</u>

The Defendant argues that the police are required to make an inquiry regarding the existence of affirmative defenses before arresting someone for violating the above law, and that probable cause to believe the crime was committed does not exist where no such inquiry was made.  The Defendant does not contend that the officer must specifically ask about each defense, but contends that there must be at least a general question regarding why the person was carrying the weapon.

7

The Government, on the other hand, contends that the potential existence of an affirmative defense is irrelevant to the determination of probable cause, and that once a person is seen openly carrying a firearm, there is probable cause to believe that an offense was committed.  To support its position, the Government relies primarily on *Bethel v. State*, 90 So.3d 410 (Fla. Dist. Ct. App. 2012).  In *Bethel*, the Court held that an officer had probable cause to arrest the defendant for openly carrying a weapon where he saw a gun protruding from the defendant's pants pocket when the defendant exited a car.  There was, however, no discussion of whether affirmative defenses needed to be considered in making this determination; the court merely relied on the totality of the circumstances.

In other cases, however, involving the carrying of concealed firearms, the Florida courts have considered the role of the affirmative defense of having a lawful permit.  In that context, in *State v. Burgos*, 994 So. 2d 1212, 1214 (Fla. 5th Dist. Ct. App. 2008) the Fifth District Court of Appeal concluded that an officer had probable cause to seize a concealed weapon once there was probable cause to believe the weapon was on the person of the defendant, holding:  "Although some citizens do have the right to carry concealed firearms lawfully, the vast majority do not.  Reasonable suspicion and probable cause are based on probabilities, not absolute certainty.  It is not necessary that police allow an individual to continue in possession of a firearm while they confirm the suspected crime to an absolute certainty."  The Third District Court of Appeal reached the same result in *State v. Navarro*, 464 So. 2d 137, 139 (Fla. 3d Dist. Ct. App. 1985) (en banc), albeit without expressly discussing the affirmative defense, stating: "The police officers' observation of the outline of a firearm amounted to *probable cause* to believe that [the defendant] was carrying a concealed weapon, justifying not merely a pat-down, but a search." *Contra Regalado v. State*, 25 So. 3d 600 (Fla. 4th Dist. Ct. App.

8

2010) (probable cause did not exist where no facts and circumstances were presented to show that defendant did not have a concealed weapons permit).

Based upon the foregoing authorities, the undersigned declines to adopt the per se rule advocated by either side; rather, the determination of whether there is probable cause to believe a defendant committed the offense of openly carrying a firearm is governed by the well-established totality of the circumstances standard.  This standard necessarily includes consideration of whether it appears that an affirmative defense exists, but does not require express questioning by the police of the existence of such a defense.  In the case at bar, it is undisputed that Defendant Spann was observed openly carrying a firearm.  The circumstances under which this was observed—walking through the courtyard of an apartment complex carrying a rifle in a high crime area known for drug trafficking and violent crimes, at 9:00 p.m. at night, where hand-to-hand narcotics transactions were taking place, and then looking up and down the street before jogging to a waiting car with an open trunk and placing the rifle into that trunk—establish probable cause to believe that the crime of openly carrying a firearm had been committed.  There is nothing in this scenario that even remotely suggests one of the affirmative defenses to this crime was present.  The mere speculative possibility suggested by defense counsel that the defendant was going hunting, or was a law enforcement officer, does not negate the conclusion based on the totality of the circumstances that there was at least "a fair probability" that the crime had been committed.

In sum, the officers had probable cause to believe that a crime had been committed, and were therefore justified in stopping the car in which the Defendant was riding, seizing the rifle, and arresting the Defendant for the crime of openly carrying a firearm.

IV.     **CONCLUSIONS OF LAW**

**Based upon the foregoing Findings of Fact and Legal Analysis, the undersigned**

**makes the following Conclusions of Law.**

**Based on the totality of the circumstances, Detective Cruz had probable cause to**

**believe that Defendant Spann had committed the offense of openly carrying a weapon**

**when Detective Cruz observed the Defendant openly carry a rifle across the courtyard of**

**an apartment complex and place it in the trunk of a car.**

**Detective Ashe had probable cause to stop the car, search the car for the rifle in**

**the trunk, seize the rifle, and arrest Defendant Spann for openly carrying the rifle, in**

**violation of Fla. Stat. § 790.053.**

**Therefore, it is hereby**

**RECOMMENDED that Defendant Christopher Spann's Motion to Suppress, ECF**

**No. [18] be DENIED.**

**Pursuant to S.D. Fla. Magistrate Judge Rule 4(b), the parties shall file any written**

**objections to this Report and Recommendation on or before May 5, 2015.  Any responses**

**to the objections shall be filed on or before May 12, 2015.  Pursuant to Fed. R. Crim. P.**

**59(b)(2), failure to file objections timely waives a party's right to review, and bars the**

**parties from attacking on appeal any legal rulings and factual findings contained herein.**

*See Thomas v. Arn*, **474 U.S. 140 (1985).**

_____

**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

Copies furnished via CM/ECF to:
The Honorable Donald L. Graham, United States District Judge
All counsel of record